CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
September 30, 2025
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JOHN HUNTER ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:23-cv-00205 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| DEPUTY ZACH CLARKSON, *et al.*, | ) | By:  Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

Plaintiff John Hunter Alexander, a Virginia inmate proceeding *pro se*, filed this civil-rights action under 28 U.S.C. § 1983 against several Defendants employed by Amherst County, and the Amherst County Sheriff's Office. The court has dismissed all claims except those against Defendant Deputy Zach Clarkson (hereinafter "Defendant" or "Clarkson"). (*See* Order, July 8, 2024 [ECF No. 62]; Order, March 25, 2025 [ECF No. 89].) Now before the court are Clarkson's motion for summary judgment (Def.'s Mot. for Summ. J. [ECF No. 73]) and motion to strike Plaintiff's surreply (Def.'s Mot. to Strike Surreply [ECF No. 85]). For the following reasons, Clarkson's motion for summary judgment will be granted, and his motion to strike will be denied.

I.

Plaintiff's claims stem from allegations that, on May 19, 2021, after an "unjust" traffic stop, Clarkson used excessive force against him during his arrest. (Am. Compl. 1–4 [ECF No. 23].) As a result of Clarkson's use of force, Plaintiff claims to have suffered a "sever[e]" broken arm that has required multiple surgeries and still has not healed. (*Id.* at 3.) In support of his motion for summary judgment, Clarkson offers evidence of the following version of events.

On May 19, 2021, the Amherst County Sheriff's Office emergency communications center received a phone call advising that a van was pulled over in a ditch near Glenway Drive and Maple Lane in Amherst, Virginia. (Def.'s Ex. 1, Dispatch Report at 2 [ECF No. 74-1].) The caller reported that the van's driver appeared to be passed out or asleep over the wheel. (*Id.*)

Clarkson responded to the call around 4:00 a.m. (Def.'s Ex. 2, Decl. of Z. Clarkson ¶ 9 [ECF No. 74-2].) Clarkson was wearing a body camera, and his vehicle was equipped with a dash camera that recorded the events that followed. (*Id.* ¶ 6; *see also* Def.'s Ex. 3, Clarkson Dash Cam Footage [ECF No. 74-3]; Def.'s Ex. 4, Clarkson Body Cam Footage [ECF No. 74-4].) Upon arriving at the scene, Clarkson observed a green/gray Chevrolet Astro van driving on Maple Lane. (Decl. of Z. Clarkson ¶ 9; Clarkson Dash Cam Footage 3:37–3:42.) Clarkson also observed tire marks in a nearby yard and smelled burnt rubber. (Decl. of Z. Clarkson ¶ 10.) Because there were no other vehicles nearby, Clarkson deduced that the Astro was the van that the caller had reportedly observed in a ditch. (*Id.* ¶ 11.)

Clarkson followed the van as it drove up Maple Lane toward Glenway Drive. (*Id.* ¶ 12; Clarkson Dash Cam Footage 3:28–3:42.) Clarkson observed the van drive slowly through a stop sign without making a complete stop. (Decl. of Z. Clarkson ¶ 13; Clarkson Dash Cam Footage 3:52–4:02.) Clarkson then called in the tags on the van to dispatch. (Decl. of Z. Clarkson ¶ 14.) Dispatch reported that the tags were registered to a 2014 four-door white Chevrolet sedan, not a green Astro van. (*Id.*)

Clarkson decided to conduct a traffic stop based on the call to the Sheriff's Office about the van, the tire marks and burnt rubber smell, the driver's failure to obey a stop sign,

the incorrect registration information, and a potential public safety hazard. (*Id.* ¶ 16.) When the van pulled into the driveway at 150 Loch Lane, Clarkson activated his vehicle's lights. (*Id.* ¶ 17; Clarkson Dash Cam Footage 4:53–5:04.)

After Clarkson activated his lights, the driver turned onto the grass at 150 Loch Lane and drove through the yard of that property onto the yard at 139 Maple Lane. (Decl. of Z. Clarkson ¶ 18; Clarkson Dash Cam Footage 5:02–5:30.) This prompted Clarkson to activate his sirens and pursue the van. (Decl. of Z. Clarkson ¶ 18; Clarkson Dash Cam Footage 5:10–5:34.) The van continued through the yard at 139 Maple Lane until it struck a tree, becoming disabled and partially blocking Maple Lane. (Decl. of Z. Clarkson ¶¶ 19–20; Clarkson Dash Cam Footage 5:20–5:34.)

Clarkson then exited his vehicle, drew his service weapon, and repeatedly ordered the van's driver to show his hands. (Decl. of Z. Clarkson ¶ 21; Clarkson Body Cam Footage 2:31–2:55.) Clarkson later learned that the driver was Plaintiff John Alexander. (Decl. of Z. Clarkson ¶ 21.) Clarkson ordered Plaintiff to stop moving multiple times, but he did not comply and moved toward the interior passenger side of the vehicle. (*Id.* ¶ 22; Clarkson Body Cam Footage 2:31–3:32.)

Plaintiff attempted to exit the van through the passenger-side door and/or window while Clarkson continued ordering him to stop moving and show his hands. (Decl. of Z. Clarkson ¶ 23; Clarkson Body Cam Footage 2:31–3:32.) Plaintiff kept inching toward the doors. (Decl. of Z. Clarkson ¶ 21; Clarkson Body Cam Footage 2:40–3:29.) Clarkson circled to the passenger-side of the van and instructed Plaintiff to take the key out of the ignition and put his hands on his head. (Decl. of Z. Clarkson ¶ 21; Clarkson Body Cam Footage 3:05–

Case 7:23-cv-00205-TTC-JCH    Document 97    Filed 09/30/25    Page 4 of 16
Pageid#: 361

3:14.) While Clarkson was at the passenger's side, Plaintiff shifted back to the driver's side, opened the driver's-side door, and fled the vehicle. (Decl. of Z. Clarkson ¶ 24; Clarkson Body Cam Footage 3:15–3:32.) Plaintiff ran into the yard of 139 Maple Lane. (Decl. of Z. Clarkson ¶ 24; Clarkson Body Cam Footage 3:31–3:40.) When Plaintiff would not stop after being ordered, Clarkson pursued him on foot. (Decl. of Z. Clarkson ¶ 25; Clarkson Body Cam Footage 3:31–3:48.)

Plaintiff eventually fell while running through a yard, and Clarkson was able to catch up with him. (Decl. of Z. Clarkson ¶ 26; Clarkson Body Cam Footage 3:40–3:48.) Clarkson followed Plaintiff to the ground and attempted to restrain him to take him into custody. (Decl. of Z. Clarkson ¶¶ 27–28; Clarkson Body Cam Footage 3:40–3:48.) But Plaintiff actively resisted arrest, refusing to comply with commands to put his hands behind his back and lashing out at Clarkson with his hands. (Decl. of Z. Clarkson ¶ 28; Clarkson Body Cam Footage 3:48–4:32.) Plaintiff attempted to strike Clarkson, and Clarkson delivered a closed-fist punch to Plaintiff's face in an attempt to defend himself and subdue Plaintiff. (Decl. of Z. Clarkson ¶¶ 29–30.) During the altercation, Plaintiff also attempted to grab Clarkson's flashlight and hit Clarkson with a stick. (*Id.* ¶¶ 31, 34.)

At one point during their struggle, Clarkson's body camera detached from his person, and Plaintiff picked up the camera and threw it away while still actively resisting arrest. (*Id.* ¶¶ 32–33; Clarkson Body Cam Footage 4:28–4:54.) At another point during their altercation, Clarkson yelled out in frustration. (Decl. of Z. Clarkson ¶ 37; Clarkson Body Cam Footage 5:29–5:21.) Clarkson told Plaintiff that he was under arrest, and when Plaintiff asked why, Clarkson answered, "For running from me." (Clarkson Body Cam Footage 5:43–5:47.)

- 4 -

While Plaintiff continued resisting, Clarkson and a nearby civilian acquaintance of Plaintiff's, Samantha Johnson, repeatedly told him to stop. (Decl. of Z. Clarkson ¶ 38; Clarkson Body Cam Footage 5:47–7:21.) Later in their struggle, Plaintiff said, "I think you broke my arm." (Clarkson Body Cam Footage 8:40–8:47.) Johnson responded, "Well if it was broke, it's by your own doing . . . Did you crash into the tree?" (*Id.* at 8:47–8:57.)

After about five minutes of physical struggle, Clarkson successfully pinned Plaintiff face-down on the ground with his arms handcuffed behind his back. (Decl. of Z. Clarkson ¶ 39.) Once Plaintiff was subdued and handcuffed, Clarkson did not utilize any additional force against him. (*Id.* ¶ 40.) Plaintiff did not lose consciousness at any point during their struggle. (*Id.* ¶ 43.) He spoke to both Clarkson and Johnson and repeatedly insisted he had done nothing wrong. (*Id.* ¶¶ 42–43.) Throughout their altercation, Clarkson smelled the odor of alcohol coming from Plaintiff's breath and person. (*Id.* ¶ 41.)

Eventually, backup officers arrived, and Lieutenant Hudson and Deputy Meeks picked Plaintiff up and escorted him away. (*Id.* ¶ 45; Clarkson Body Cam Footage 13:05–14:08.) Clarkson was winded from the struggle with Plaintiff and did not help pick Plaintiff up off the ground. (Decl. of Z. Clarkson ¶ 46; Clarkson Body Cam Footage 12:58–14:08.) Plaintiff did not immediately complain of arm pain while Hudson and Meeks escorted him but later told EMS responders that his shoulder and arm were hurt. (Decl. of Z. Clarkson ¶ 45.)

Clarkson vomited because of the physical exertion involved in trying to subdue Plaintiff, and EMS provided medical attention to assist him. (*Id.* ¶¶ 48–49; Clarkson Body Cam Footage 54:39–58:08.)

Police later ran the Vehicle Identification Number for the van Plaintiff had been driving, and it came back stolen from Nelson County. (*Id.* ¶ 50.) Inside the van, police found a bag of prescription drugs belonging to Johnson. (*Id.* ¶ 51.) Johnson later told the police that Plaintiff had taken the drugs without her permission. (*Id.* ¶ 52.)

On February 3, 2022, Plaintiff pled guilty to charges of Assault on a Law Enforcement Officer and Felony Eluding based on the May 19, 2021 incident with Clarkson. (Def.'s Ex. 5, Amherst Circuit Court Records at 1, 7 [ECF No. 74-5].)

Plaintiff does not offer any evidence in connection with his opposition to Clarkson's motion for summary judgment, only the unsworn statements contained in his response brief. (*See* Pl.'s Resp. in Opp'n to Summ. J. 1–6 [ECF No. 86].) He alleges, but has not offered any evidentiary support showing, that Clarkson broke his arm during their altercation and that he required two surgeries, a plate, and six screws to repair the break and that, two years later, he still had not fully recovered. (*See* Am. Compl. 3.) He claims that Clarkson used excessive force in pursuing and arresting him, in violation of the Eighth Amendment. (*Id.*) Plaintiff also claims that Clarkson violated his Fourth Amendment rights because the traffic stop was not justified. (*Id.* at 4.)

After Defendant filed his reply brief, Plaintiff filed a second brief opposing summary judgment. (*See* Pl.'s Second Reply to Mot. for Summ. J. [ECF No. 83].) In that brief, Plaintiff apologized to the court for his "haste" in his fist response brief, stating that he had received notification from the court that Defendant Clarkson had moved for summary judgment but that he had not received Defendant's actual motion and briefing until after he had submitted

his first response. (*Id.* at 1.) That same day, he also submitted a one-page "Response to Defendant's Reply." (*See* Pl.'s Resp. to Def.'s Reply in Supp. of Summ. J. [ECF No.84].)

In his second brief, Plaintiff stated that he had received from Defendants a flash drive containing video evidence but that he lacked the means to view it in his current place of incarceration. (*Id.*) Plaintiff therefore sent the footage to an associate of his for review. (*Id.*) He claims that his associate's notes from the footage suggested that Plaintiff was in fact conscious after Defendant broke his arm, though Plaintiff believes he was unconscious. (*Id.*) Plaintiff therefore suspected that Defendant had tampered with the video evidence and repeatedly sought to obtain additional copies of the dash cam and body cam footage from sources other than Defendant. (*See id.*; *see also* Pl.'s Mots. for Subpoena [ECF Nos. 64, 81, 93].) However, after ensuring Plaintiff had copies of and could access the video evidence produced by Defendant, the court ultimately concluded that Plaintiff's unsupported accusations about Defendant's tampering did not raise any genuine issue as to the authenticity of the footage and declined to delay the case longer in a continued effort to obtain the same videos from a non-party source. (*See* Order, Aug. 28, 2025 [ECF No. 96].)

Defendant subsequently filed a motion to strike Plaintiff's second and third briefs, arguing that they were impermissible surreplies. (*See* Def.'s Mot. to Strike Surreplies 1–4.) But given Plaintiff's *pro se* status, the fact that he is incarcerated and experiences occasional delays in receiving court documents, and Plaintiff's statements that he submitted his first brief before having reviewed Defendant's summary judgment briefing or evidence, the court will deny Defendant's motion and consider all briefs in ruling on Defendant's motion for summary judgment.

Having made this ruling, the court now turns to the merits of Defendant's summary judgment motion.

## II.

Summary judgment under Rule 56 "allows a case to be resolved before and without a trial when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 352 (4th Cir. 2024) (citing Fed. R. Civ. P. 56(a)). "The court's role in ruling on such a motion is not to assess the truth of any fact alleged or to weigh facts, as would a jury in finding facts, but only to determine whether facts are disputed *and* whether the disputed facts are material." *Id.* (citations omitted).

In deciding a motion for summary judgment, "the court construes all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 958 (4th Cir. 2022). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874−75 (4th Cir. 1992). And "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate if there are genuine

disputes of material fact and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.*, but is appropriate "when the evidence is so one-sided that one party must prevail as a matter of law." *Tekmen*, 55 F.4th at 959.

### III.

Plaintiff's claims arise under 42 U.S.C. § 1983, which authorizes a civil action by a citizen who is deprived of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person acting under color of state law. To establish a claim under § 1983, a plaintiff must show both (1) "the violation of a right secured by the Constitution and laws of the United States" and (2) "that the alleged deprivation was committed by a person acting under color of state law." *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011) (quoting *West v. Atkins,* 487 U.S. 42, 48 (1988)).

Defendant Clarkson moves for summary judgment on the grounds that (1) claims against him in his official capacity are not cognizable under 42 U.S.C. § 1983, (2) he is entitled to summary judgment Plaintiff's Eighth Amendment claim because Plaintiff was not a convicted prisoner at the time of the traffic stop and arrest, (3) no reasonable jury would find that Clarkson violated the Fourth Amendment, and (4) Clarkson is entitled to qualified immunity on Plaintiff's claims. (*See* Memo. in Supp. of Def.'s Mot. for Summ. J. 11 [ECF No. 74].)

#### A. Official-Capacity Claims

To the extent Plaintiff raises claims against Clarkson in his official capacity, in addition to claims against him in his individual capacity, those claims fail as a matter of law. Any claim against Clarkson in his official capacity is effectively a claim against the Amherst County

Sheriff's Department. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." (cleaned up)); *see also Cline v. Auville*, No. CIVA 1:09-0301, 2010 WL 1380140, at *4 (S.D. W. Va. Mar. 30, 2010) ("A § 1983 claim against Auville is his official capacity as a police officer for the McDowell County Sheriff's Department is essentially a claim against the McDowell County Sheriff's Department."); *Massasoit v. Carter*, 439 F. Supp. 2d 463, 480 (M.D.N.C. 2006), *aff'd*, 253 F. App'x 295 (4th Cir. 2007) ("The official capacity claims against Butler and defendant Carter are effectively a suit against the Moore County Sheriff's Department itself.").

Sheriff's departments are not "persons" capable of § 1983 liability, and claims against sheriff's departments are not cognizable under Virginia law. *See Thompson v. City of Danville, Va.*, No. 4:10cv00012, 2011 WL 2174536, at *4 (W.D. Va. June 3, 2011) (collecting cases). Thus, because the claims against Clarkson in his official capacity are treated as claims against the Sheriff's Department, Plaintiff cannot hold Clarkson liable under § 1983 in his official capacity. Accordingly, the court will grant Clarkson's motion for summary judgment on Plaintiff's official-capacity claims.

### B. Eighth Amendment Claims

Plaintiff purports to bring his excessive-force claims against Clarkson under the Eighth Amendment. (*See* Am. Compl. 1–3.) But Clarkson is correct that the Eighth Amendment's right to be free from cruel and unusual punishment does not attach until after a person has

been convicted of a crime. *See Meyler v. Mayor & City Council of Ocean City*, 736 F. Supp. 3d 272, 292 (D. Md. 2024); *see also Ingraham v. Wright*, 430 U.S. 651, 671 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."). And while claims of excessive force to subdue a convicted prisoner are analyzed under the Eighth Amendment, claims that excessive force was used to effect an arrest are analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citing *Tennessee v. Garner*, 471 U.S., 1, 7–22 (1985); *Whitley v. Albers,* 475 U.S. 312, 318–326 (1986)).

Here it is undisputed that Plaintiff was an arrestee rather than a convicted prison at the time of the events underlying his claims. Therefore, Clarkson is entitled to judgment as a matter of law on any claim under the Eighth Amendment, and the court will award him summary judgment on Plaintiff's Eighth Amendment claim.

**C. Fourth Amendment Excessive-Force Claim**

Plaintiff's excessive-force claims are properly understood as Fourth Amendment claims. *See Barnes v. Felix*, 605 U.S. 73, 79 (2025) ("A claim that a law enforcement officer used excessive force during a stop or arrest is 'analyzed under the Fourth Amendment.'" (quoting *Graham*, 490 U.S., at 395)). The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is 'reasonableness,' as measured in objective terms." *Barnes*, 605 U.S. at 79 (cleaned up). The primary question in Fourth Amendment excessive-force cases "is whether the force deployed was justified from 'the perspective of a reasonable officer on the scene,' taking due

account of both the individual interests and the governmental interests at stake." *Id.* (quoting *Graham*, 490 U.S., at 396; citing *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017)).

The "inquiry into the reasonableness of police force requires analyzing the totality of the circumstances." *Id.* at 80 (citations and internal quotation marks omitted). "There is no 'easy-to-apply legal test' or 'on/off switch' in this context." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 382–83 (2007)). Instead, "analyzing the merits of excessive force claims 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) (citations omitted). (quoting *Graham*, 490 U.S. at 396).

Plaintiff's conduct leading up to and during the altercation conclusively establishes the reasonableness of the force Clarkson employed. *See Barnes*, 605 U.S. at 80 ("[T]he stopped person's conduct is always relevant because it indicates the nature and level of the threat he poses, either to the officer or to others."). By the time Clarkson actually used physical force against Plaintiff, he had refused to pull over when signaled with lights and sirens, had driven through private yards and crashed into a tree in the attempt to flee, had failed to comply with repeated commands to show his hands and stop moving, had run from the vehicle after being stopped and approached by Clarkson, and had fled the scene of the accident on foot. Under these circumstances, Plaintiff active attempts to flee weigh in favor of finding that Clarkson used reasonable force. *See Graham*, 490 U.S. at 396.

Once Clarkson caught up with Plaintiff, Plaintiff continued to actively resist arrest. Plaintiff alleges in his amended complaint and argues in his first summary judgment response that he "begged and pleaded for Deputy Clarkson to get off of [him]" and told Clarkson "that [he] could not breathe." (Pl.'s Resp. in Opp'n to Summ. J. 1; *see also* Am. Compl. 2–3.) But Clarkson's body camera footage refutes these claims. The available video and audio show that Plaintiff was lucid, speaking, and actively struggling against Clarkson until Clarkson ultimately subdued and handcuffed Plaintiff. At no point in the video can Plaintiff be heard begging, pleading, or stating that he couldn't breathe.

"[W]hen a video 'quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris,* 550 U.S. 372, 378–80 (2007)). Here, the irrefutable evidence shows that the force Clarkson used to subdue and arrest Plaintiff was reasonable under the circumstances. Plaintiff was actively resisting arrest and attempting to flee throughout their minutes-long struggle. Plaintiff attempted to strike Clarkson with his hands and did hit him with a stick. He also tried to grab Plaintiff's flashlight and threw Clarkson's body camera away from them while they were struggling. Plaintiff's conduct shows he actively resisted arrest and that he posed an immediate threat to Clarkson's safety while the officer was attempting the arrest. And at that point, Clarkson had probable cause to believe Plaintiff had not only fled the scene of an accident in violation of Va. Code § 46.2-894, but also that he had disregarded a signal from a law-enforcement officer to stop, *i.e.*, eluded the police, in violation of Va. Code § 46.2-817, and assaulted a law enforcement

officer, in violation of Va. Code § 18.2-57. His active resistance, the threat he posed to Clarkson, and the seriousness of the offenses for which he was suspected all weigh in favor of reasonableness. *See Graham*, 490 U.S. at 396.

Plaintiff has offered no evidence to genuinely dispute the reasonableness of the use of force demonstrated by Clarkson. Under the totality of the circumstances, no reasonable jury would find that the force Clarkson employed was so excessive as to violate the Fourth Amendment. The court will therefore grant summary judgment in Clarkson's favor on Plaintiff's excessive-force claim.

### D. Fourth Amendment Unreasonable Seizure Claim

Lastly, Plaintiff claims that Clarkson violated his Fourth Amendment rights by initiating the traffic stop without sufficient justification. (*See* Am. Compl. 4.) Plaintiff does not challenge the ultimate arrest as unreasonable, only the initial traffic stop. (*See id.*)

"Seizures of persons generally must be supported by probable cause," but "police may constitutionally conduct a brief, investigatory stop when an officer as a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Perry*, 92 F.4th 500, 509 (4th Cir. 2024), *cert. denied*, 144 S. Ct. 2643, 219 L. Ed. 2d 1275 (2024) (citing *Dunaway v. New York*, 442 U.S. 200, 208–09 (1979); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)) (internal quotation marks omitted). A traffic stop may be justified by either probable cause or reasonable suspicion. *Id.* at 510 (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 & n.29 (1984)). However, a police officer "may not extend the stop beyond the scope of its initial mission without 'either the driver's consent or a reasonable suspicion that illegal activity is afoot.'" *Id.* (quoting *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011)).

Plaintiff alleges that the traffic stop was unreasonable because he did come to a full stop at the stop sign before Clarkson pulled him over. (*See* Am. Compl. 4.) He also contends that the fact that Clarkson did not activate his lights until after Plaintiff pulled into the driveway supports his position that the stop was unreasonable. (*See id.*)

Defendant counters that the stop was reasonable because he had a reasonable suspicion that Plaintiff had left the scene of an accident, in violation of Va. Code § 46.2-894 and Va. Code § 46.2-896. (Memo. in Supp. of Def.'s Mot. for Summ. J. 13.) He cites his knowledge of the dispatch call reporting a van in a ditch, the tire marks through someone's year, and the smell of burnt rubber, along with Plaintiff's vehicle leaving the area as creating reasonably suspicion. (*See id.*) He argues Plaintiff's failure to come to a complete stop at the stop sign gave him further cause to initiate the stop. (*Id.*)

The video evidence establishes that Plaintiff slowed as he approached the stop sign but did not come to a complete stop. (*See* Clarkson's Dash Cam Footage 3:52–4:02); *see also Witt*, 633 F.3d at 276 (video evidence contradicting plaintiff's version of events trumps plaintiff's unsupported claims about what happened). An officer's personal observation that a vehicle ran a stop sign establishes probable cause that a traffic violation occurred. *Perry*, 92 F.4th at 510.; *see also United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993) ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." (citations omitted)). And even if Plaintiff had not run the stop sign, Clarkson has conclusively established that he reasonably suspected Plaintiff of fleeing the scene of an accident. *Cf. Emesowum v. Arlington Cnty.*, No. 1:20-CV-113, 2020 WL 3050377, at *11 (E.D. Va. June 5, 2020) (finding traffic stop was justified by reasonable suspicion that plaintiff was

fleeing the scene of an accident based on a call-for-service that reported plaintiff leaving an accident site).

Under the circumstances, no reasonable jury would find that the initial traffic stop was not supported by reasonable suspicion or probable cause and thus violated the Fourth Amendment. The court will therefore grant Clarkson's motion for summary judgment on this claim as well.

## IV.

For the reasons set forth above, Defendant Clarkson's motion to strike Plaintiff's surreply will be denied, and Defendant's motion for summary judgment will be granted.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 30th day of September, 2025.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE